**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOWN OF SOUTHAMPTON, NEW YORK,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR and SCOTT DAVIS in his official
capacity exercising the delegated authority of
the Assistant Secretary – Indian Affairs, 1849
C Street, N.W. MS-4660-MIB Washington,
DC 20240,

    Defendants.

Civil Action No.: 1:25-cv-02541

**COMPLAINT**

## INTRODUCTION

1.    Plaintiff the Town of Southampton, New York (the "Town") brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA") against the United States Department of the Interior (the "Department" or "DOI") and Scott Davis ("Davis"), in his official capacity exercising the delegated authority of the Assistant Secretary – Indian Affairs ("AS-IA") to challenge Defendants' arbitrary, capricious, and otherwise unlawful action when directing the Bureau of Indian Affairs ("BIA") to record as "restricted fee" the title to certain land within the Town's jurisdiction owned in fee by the Shinnecock Indian Nation (the "Nation").

2.    The Town is a municipal corporation organized under the laws of the state of New York, with regulatory jurisdiction over an approximately 140 square mile area between the Town of Brookhaven to the west and the Town of East Hampton to the east comprising 18 hamlets and 7 incorporated villages.

3.    The fee land at issue is an approximately 80-acre parcel located in the Hampton Bays area of the Town, known as "Westwoods."

4.    The Westwoods parcel is not part of and not contiguous with the Nation's federally recognized reservation, situated elsewhere on Long Island.  The Nation's reservation is not at issue in this action.

5.    Westwoods is a separate parcel acquired by the Nation some 200 years after the Nation's aboriginal title was extinguished by a series of conveyances recognized and ratified by the prevailing sovereign authority before the United States even existed.  The approximate locations of Westwoods and the Nation's reservation are indicated on the GIS map below.



6.    By this action, the Town does not challenge the Nation's fee ownership of Westwoods.  Rather, this action challenges the administrative process by which the Department changed Westwoods' status in a manner that, according to the Nation, has the dual effects of stripping the Town's long-settled jurisdiction and installing the Nation as the sole non-federal sovereign government over the Westwoods parcel.

## THE CHALLENGED ACTION

7.     The Nation claims that it asked DOI to conduct an "investigation" three years ago concerning the Nation's fee ownership of Westwoods, and that the DOI's instruction to BIA to record Westwoods as restricted fee is a "dispositive determination" that "removes any basis for the Town's attempt to exert regulatory jurisdiction over Westwoods Territory."[1]

8.     This purported determination comprised a single-page "[m]emorandum," dated December 23, 2024 from then AS-IA, Bryan Newland ("Newland") addressed to Kimberley Bouchard, Regional Director, Eastern Region of the BIA, directing her staff to record title to Westwoods in the BIA's Trust Asset and Accounting Management System ("TAAMS") as *restricted fee*.[2]

9.     The Newland Memorandum constitutes final agency action with respect to the Department's instruction to BIA to record Westwoods in TAAMS as restricted fee.  Westwoods now has been recorded as restricted fee, according to a "Title Status Report" signed by Jamie Allen, Manager of the Branch of Land Titles and Records for the BIA.[3]  This recordation also constitutes final agency action.

10.     According to the Nation, the DOI action embodied by the Newland Memorandum also has the effect of recognizing Westwoods as Indian country, such that the Town's regulatory jurisdiction over that parcel is destroyed.[4]

---

[1]     *Town of Southampton, et al., v. Lisa Goree, et al.*, Index No. 631610/2024 (N.Y. Sup. Ct. Suffolk Cnty.) (the "*State Action*"), Dkt. No. 74, at 7.
[2]     *See* Ex. A (the "Newland Memorandum").
[3]     *See Shinnecock Indian Nation v. Town of Southampton, et al.*, Case No. 2:25-cv-03392-NJC-JMW (E.D.N.Y.) (the "*Palm Tree Festival Action*"), Dkt. No. 11 Ex. A, ECF pp. 182-189.  The Nation filed the *Palm Tree Festival Action* against the Town and its officers on June 17, 2025, alleging that it feared the Town would attempt to enforce its zoning authority to prevent the Nation from hosting an event called the Palm Tree Music Festival scheduled for June 21, 2025.  *See id.*, Dkt. No. 11 at ¶ 63.
[4]     *See Palm Tree Festival Action*,  Dkt. No. 11 at ¶¶ 35 ("The recording of the Westwoods constituted the official act of a federal agency, the BIA.") & 69 ("Defendants [the Town and its officers] seek to force the Nation, acting in Indian Country, to comply with the Southampton Town Code.").

11.     Agency action stripping the Town of jurisdiction over Westwoods violates the APA.  Defendants failed to provide any cogent rationale supporting their determination; ignored the vast body of law and fact developed by state and federal courts as to the ownership *of this particular parcel*; relied upon purported factual conclusions unsupported by substantial evidence; and failed to abide by the Department's own regulations governing determinations that have the effect of stripping civil jurisdiction from states and local governments—including notice to those governments and an opportunity to participate in the Department's review.

### A.     The Newland Memorandum Does Not Provide A Cogent Rationale To Determine That Westwoods Is Indian Country.

12.     The Newland Memorandum does not purport to determine that Westwoods is "Indian country" under 18 U.S.C. § 1151.

13.     The Newland Memorandum does not find that the Nation holds aboriginal title to Westwoods, as distinct from ownership in fee.

14.     What the Newland Memorandum does find is that Westwoods, like many other non-reservation parcels on eastern Long Island—including the Town of Southampton itself—is situated within the boundaries of the Nation's aboriginal territory.[5]

15.     The Newland Memorandum also asserts that the Nation has "resided within its aboriginal territory since time immemorial."[6]

16.     The Newland Memorandum purports to rest solely upon "the legal conclusions of the Solicitor's Office and the advice that office has provided [Newland]," including the view of such office that Westwoods is within the purview of the Nonintercourse Act, 25 U.S.C. § 177.[7]

---

[5]     *See* Ex. A.
[6]     *See id.*
[7]     *See id.*

17.     That rationale is most notable for its many omissions—it does not purport to find that the Nation "has resided" *on the Westwoods parcel*, as distinct from other areas within the Nation's aboriginal territory (which includes the entire Town and "other parts" on Long Island), or that the Nation has never been removed from Westwoods.[8]

18.     Rather, the Newland Memorandum recites that the boundaries of the Nation's aboriginal territory go far beyond just Westwoods; that it "encompasses the Town of Southampton and other lands on eastern Long Island, NY." Under the rationale of the Newland Memorandum, it follows, any lands within that boundary are therefore within the purview of the Nonintercourse Act and should be recorded as owned by the Nation in restricted fee.[9]

19.     The Newland Memorandum excludes any supporting legal authority or analysis from the Solicitor's Office, and fails to explain what documents, testimony, or reports concerning the "ownership history of Westwoods" the Solicitor's Office may or may not have reviewed.[10]

20.     Although DOI's own response to public comment on its rulemaking acknowledges that "[d]etermining the location and extent of a Tribe's aboriginal lands often requires a lengthy review of applicable law and fact,"[11] the Newland Memorandum excludes any cogent explanation of this typical "lengthy" review of applicable law and fact.

21.     Following notice of the Newland Memorandum, the Town submitted a Freedom of Information Act ("FOIA") request seeking "all documents submitted to or otherwise considered by the Department" in connection with its stated review.[12] The FOIA request explicitly requested

---

[8]     *See id.*
[9]     *See id.*
[10]    *See id.*
[11]    Land Acquisition Release, 88 Fed. Reg. 86241.
[12]    *See* Ex. B (DOI Acknowledgement of the Town's January 21, FOIA Request to DOI, which includes complete body of Town's FOIA Request).

that the Department identify any documents removed and not furnished with its response, and a brief description of the basis for withholding.[13]

22.     On March 21, 2025, the Department responded to the Town's FOIA request, producing a sum total of two PDF documents as its "final release"—the Newland Memorandum and an August 2024 document titled "The Westwoods Legal Description."[14]  The Department identified no other documents responsive to the Town's request.

23.     The stated rationale within the Newland Memorandum does not support—and in fact, contradicts—a finding of intact aboriginal title.  The Newland Memorandum acknowledges that the Nation "was adjudicated to be the fee owner of Westwoods as of approximately 1830," citing two Suffolk County Supreme Court decisions that found the Nation had fee title to Westwoods not by aboriginal title but, rather, "by means of adverse possession."[15]

**B.     The Newland Memorandum Entirely Fails To Acknowledge, Much Less Distinguish, Prior Legal Proceedings Involving Title To Westwoods.**

24.     The same issues presented to the Department resulting in the Newland Memorandum have been advanced and litigated by the Nation or its proxies for two decades, resulting in presiding courts repeatedly confirming or reaffirming the regulatory jurisdiction of the Town of Southampton and the state of New York over the Westwoods parcel.

25.     There is no indication that the Department even considered, much less distinguished or explained, these legal authorities or the substantial evidence introduced in those proceedings.  Indeed, the late December timing of the Newland Memorandum is particularly

---

[13]     *See id.*
[14]     *See* Ex. C (DOI's March 21, 2025 "final response" to the Town's FOIA Request, including exhibits).
[15]     *See* Ex. A.

notable on the heels of a December 2024 New York Appellate Division decision *against* the Nation that recognized the Nation's *fee simple* ownership of Westwoods.[16]

26.    The Town has exercised exclusive jurisdiction over Westwoods for hundreds of years, subdivided the land, regulated timber harvesting, widened and improved the public road that runs through Westwoods, and provided police, fire, and emergency services to Westwoods.

27.    The Town is actively engaged in litigation in the Supreme Court of the State of New York against the Nation's Council of Trustees (the "Trustees") to enjoin the Trustees' construction of a commercial travel plaza (the "Travel Plaza") on Westwoods in violation of Town Code, residential zoning, and New York state law.  That development is currently enjoined by the state court on a finding that the Town is likely to succeed on its claim that the Nation's aboriginal title to Westwoods was extinguished hundreds of years ago.[17]

28.    Westwoods has been the subject of multiple lawsuits between the Town, the state of New York, the state's Department of Transportation, and the Trustees, all concerning the Nation's various attempts to subvert or displace local and state government over Westwoods.  In 2007, the Nation litigated its efforts to build a casino on Westwoods without having to recognize the Town's and state's jurisdiction; that effort was rejected by the U.S. District Court for the Eastern District of New York following a 30-day trial with more than 20 witnesses, 600 exhibits, and 4,000 pages of transcripts.[18]  In 2019, the Nation litigated its efforts to erect massive 60-foot billboards in the state highway right-of-way that runs through Westwoods along Route 27, Sunrise Highway; that effort was rejected by the New York Appellate Division.  Since last year, the Nation

---

[16]    *Comm'r of New York State Dep't of Transportation v. Polite*, 236 A.D.3d 82, 85, 225 N.Y.S.3d 106, 130 (2d Dep't 2024).

[17]    *See State Action*, Dkt. No. 96.

[18]    *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185 (E.D.N.Y. 2007) ("*Shinnecock I*"), *as amended* (Feb. 7, 2008), *vacated and remanded (on jurisdictional grounds)*, 686 F.3d 133 (2d Cir. 2012).

has been litigating the aforementioned effort to construct a 20-bay travel plaza on Westwoods; that effort was rejected by the New York Supreme Court and is currently enjoined.

29.    Despite this extensive public record concerning Westwoods litigation, the Newland Memorandum does not explain whether the Solicitor's Office's "legal review" encompassed any of the materials in the various lawsuits, or the lawsuits themselves.

30.    In all of these cases, the Nation (or through its Trustees) has sought to avoid local and state civil jurisdiction over Westwoods through some variation of the grounds that the Nation's aboriginal title has remained intact or been restored—alternatively arguing that Westwoods should be considered part of the Shinnecock reservation, or that record title status is irrelevant to Tribal sovereignty, or that federal regulations governing Tribal leases should apply to Westwoods. Even if those efforts had not been uniformly rejected, the holdings and evidence associated with these multiple actions still would constitute an important aspect of the issue concerning the Nation's ownership status of Westwoods. That courts have repeatedly rejected Tribal sovereignty and recognized the Town as the sovereign over Westwoods makes considering those sources all the more important, particularly as the evidence in the 2007 case was found to have "overwhelmingly demonstrated" that the Nation's aboriginal title to Westwoods was extinguished in the 17th century.[19] And in multiple actions the Nation has stipulated that its title to Westwoods is in fee.

**C.    The Newland Memorandum's Determination Is Not Based On Substantial Evidence.**

31.    While the Newland Memorandum does not provide a reasoned explanation for how—or whether—Westwoods is "Indian country," DOI's determination is bound up with several

---

[19]    *See id.*, at 188.

factual conclusions that appear to underlie the Solicitor's Office's "legal conclusions" on which DOI "[b]ased" its instruction to BIA to record Westwoods as restricted fee.[20]

32.     The Newland Memorandum asserts that the Solicitor's Office determined that Westwoods is within the boundaries of the Nation's aboriginal territory "which encompasses the Town of Southampton and other lands on eastern Long Island, NY."[21]

33.     The Solicitor's Office also is reported to have reached the factual conclusion that "[t]he Nation has resided within its aboriginal territory since time immemorial and has never [been] removed therefrom."[22]

34.     Not only are these factual assertions conclusory as there is no cited evidence for them in or appended to the Newland Memorandum, but the documents produced in the final release,[23] also do not provide any support for them.

35.     The lack of record evidence for purported factual conclusions about the Nation's aboriginal territory and that the Nation allegedly has been "never removed therefrom"[24] is particularly conspicuous as DOI's own regulations admit that "[d]etermining the location and extent of a Tribe's aboriginal lands often requires a lengthy review of applicable law and fact."[25]

36.     Here, the Newland Memorandum peddles in factual assertions that typically require a lengthy review of historical facts, yet there is no supporting evidence in the record.

37.     No reasonable mind could accept that the Department's conclusion as to Westwoods being restricted fee is supported by *substantial* evidence, as there does not appear to be *any* evidence for the factual conclusions underlying its action.

---

[20]     *See* Ex. A.
[21]     *See id.*
[22]     *See id.*
[23]     *Supra* ¶ 22.
[24]     *See id.*
[25]     Land Acquisition Release, 88 Fed. Reg. 86241.

**D.    The Newland Memorandum Did Not Comport With Any Recognized Procedure For Evaluating Potential Incursions Into The Sovereignty And Jurisdiction Of State And Local Governments.**

38.    The Town is the local civil authority authorized to enforce Town Code and New York state law within the territorial limits of its jurisdiction, including over the Westwoods parcel.

39.    The Newland Memorandum issued without warning or advance notice to the Town or the public during Christmas week, on the heels of a December 4, 2024 decision by the Appellate Division of the Supreme Court of the State of New York enjoining the Trustees' construction of billboards in the state right-of-way that runs through the Westwoods parcel.  The state appellate court held there that the Nation's ownership of Westwoods in fee simple did not permit the Nation to evade the state's sovereignty and jurisdiction over Westwoods.[26]

40.    Over the late December holidays, based on publicly available documents, Mr. Newland appears to have met with lead counsel for the Nation and her family.

41.    On January 2, 2025, two weeks before his term expired, Mr. Newland issued a letter to the Town first notifying it of the Newland Memorandum and the alleged "examin[ation]" to which it refers.[27]  The January 2 notice did not purport to copy any other recipient, and the notice did not enclose a copy of the Newland Memorandum itself.  The Town obtained a copy of the Newland Memorandum only via separate FOIA request to which the Department first responded weeks after the Newland Memorandum issued.

42.    By letter dated January 10, 2025, outside counsel to the Nation wrote to the Town that the Nation was aware that the Town had received the January 2 letter.[28]  The Nation asserted that the January 2 letter "confirmed" that the regulatory jurisdiction of the Town had been

---

[26]    *See Polite*, 236 A.D.3d at 85.
[27]    *See* Ex. D (Jan. 2, 2025 DOI Letter addressed to the Town, including copy of the "The Westwoods Legal Description" referenced therein).
[28]    *See* Ex. E (Jan. 10, 2025 letter from Trustees' counsel to the Town and its attachments).

supplanted and that, accordingly, the Town's lawsuit seeking to enjoin development activity on Westwoods was "baseless," "unsupported," and "frivolous."[29] The referenced lawsuit is the *State Action* in which the court found in March 2025 that the Town is likely to succeed on the merits of its claim that the Nation's aboriginal title had been extinguished hundreds of years ago, and issued an injunction against the Nation's Trustees continuing to develop Westwoods.

43.    Prior to the January 2 letter, DOI neither informed the Town of "the Nation's request," nor provided the Town with an opportunity to submit evidence or otherwise participate in whatever administrative review of Westwoods' ownership history may have been undertaken.

44.    The January 2 letter directed the Town to submit any questions to Eastern Regional Director Kimberly Bouchard at the BIA.[30]

45.    The Town made repeated requests to Ms. Bouchard at the BIA, to which it never received a response.

46.    The Town managed to reach by telephone an individual who identified as a BIA attorney with Bouchard's office. The Town communicated its concerns with the lack of support in the January 2 letter, but never received any response, supplementation, or further communication from the BIA.

47.    The reality is that the BIA played no role in any evaluation of the land title status of Westwoods, and had nothing to report in response to inquiry.

48.    The action taken by the BIA at the direction of the Department was ministerial and reflected no exercise of judgment or analysis by the BIA at all.

49.    To avoid any argument that it had failed to exhaust the administrative process to challenge the record change by the BIA, on January 27, 2025, the Town noticed an appeal to the

---

[29]    *See id.*
[30]    *See* Ex. D.

Interior Board of Indian Appeals ("IBIA"), challenging the BIA's action changing the land title status of Westwoods in TAAMS.[31]

50.    On or about February 4, 2025, the Town received the Board's "Pre-Docketing Notice" questioning whether the IBIA had jurisdiction to hear the appeal and, importantly, expressing skepticism whether the Town had standing to appeal because the DOI Action "did not purport to make any determination concerning the Town's longstanding jurisdiction over" Westwoods.[32]  The Board explained that the DOI action directing BIA to record title to Westwoods as restricted fee appeared distinct from the Trustees' assertion of displaced jurisdiction; in other words, that the Town's injury—impact on its government sovereignty over Westwoods—was not "caused by action of the Regional Director."[33]

51.    The Town did not submit any further briefing to the IBIA.

52.    By Order dated July 7, 2025 and received July 14, 2025, the IBIA concluded that the Regional Director's action "to record title to the Westwoods parcel in TAAMS as owned by the Nation in restricted fee status was ministerial because she was carrying out the written instruction that the Assistant Secretary had given to do so."[34]  Having found that it lacked jurisdiction over the appeal, the IBIA did not further address the Town's standing.

53.    That decision establishes that the Newland Memorandum constitutes final agency action by the Department of the Interior subject to challenge under 5 U.S.C. § 704.[35]

54.    As relevant here, the process employed by the DOI for establishing Tribal sovereignty and displacing the local civil government over a parcel of land held in fee is an

---

[31]    *See* Ex. F (Jan. 27, 2025 Town's Notice of Appeal with IBIA and its attachments).
[32]    *See* Ex. G (Feb. 4, 2025 IBIA "Pre-Docketing Notice").
[33]    *Id.*, at 3.
[34]    *See* Ex. H (July 7, 2025 IBIA "Order Docketing and Dismissing Appeals").
[35]    *See id.*, at 71 IBIA 73, n. 1 ("[T]he Assistant Secretary's decisions are final for the Department.").

application for fee-to-trust acquisition. The Department evaluates such applications under regulations at 25 C.F.R. § 151 when Tribes make requests for the Department to take land into trust under 25 U.S.C. § 5108.

55. These regulations provide that state and local governments having regulatory jurisdiction over the land subject to an application to recognize Tribal sovereignty in this way will be provided written notice of the application and an opportunity to participate in the Department's evaluation.[36]

56. The Department did not provide the Town with written notice prior to January 2, 2025 that the Department was evaluating the land title status of Westwoods; neither did the Department provide the Town an opportunity to submit information or otherwise participate in any such evaluation.

57. As explained herein, while DOI's regulations provide local governments with notice and an opportunity to be heard regarding fee to trust acquisitions that impact local governments' jurisdiction, DOI's regulations do not appear to provide similar notice and opportunity for restricted fee designations.

58. The Department did not consider any materials from the Town relevant to the issue being "investigat[ed],"[37] including the voluminous materials that led the *Shinnecock I* court to find that the evidence "overwhelmingly demonstrated" that the Nation's aboriginal title to Westwoods had been extinguished in the 17th century.[38]

59. The action by the Department as reflected in the Newland Memorandum does not include any of the indicia required of agency action under the APA, 5 U.S.C. § 704. It lacks any

---

[36]    25 C.F.R. § 151.11(c); 88 Fed. R. 86222.
[37]    *State Action*, Dkt. No. 74, at 7.
[38]    *See Shinnecock I*, 523 F. Supp. 2d at 188.

reasoned analysis based on record evidence; it wholly fails to account for important aspects of the issue before it; it relies on factual conclusions unsupported by substantial evidence; and without explanation or support, it meaningfully departs from the established processes for issuing any decision that would have the effect of interfering with the sovereignty and jurisdiction of the state and local governments with regulatory jurisdiction over the parcel at issue.

60.    In reliance on the DOI action, the Nation refuses to obey Town Code and New York state law, which makes it impossible for the Town to carry out its obligations[39] to enforce Town Code and New York state law to protect its citizens and the public.

61.    As superintendent of the Town, the Town has a concrete governmental interest in the status of land parcels within the town, apart from the Town's interest in regulating parcels. The Town, therefore, has an interest in the use of land within its jurisdiction and seeks to challenge DOI's action that impacts the use of land within the confines of the Town.[40]

62.    For these reasons, the Town now seeks this Court's review of the Newland Memorandum under 5 U.S.C. § 704, a declaration that the Department's action was arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law, and was unsupported by substantial evidence, and for this Court to vacate that action and remand to the Department for further proceedings in accordance with law.

---

[39]    As a municipality, the Town is charged with the rights and obligations to protect the health and safety of its residents. *See People v. Passantino*, 83 Misc. 2d 409, 412, 372 N.Y.S.2d 451, 455 (Rochester City Ct. 1975) ("It has long been an established ruled that [a municipality] may pass such laws necessary to protect the public health, safety, welfare[,] and interests of its citizens").

[40]    *Accord, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (neighbor of Indian land had standing to challenge fee to trust acquisition because "neighbors to the use [of this land] . . . are reasonable—indeed, predictable—challengers of [such decision]: Their interests, whether economic, environmental, or aesthetic, come within § 465's regulatory ambit").

## PARTIES

63.     Plaintiff the Town is a municipal corporation located in Suffolk County, New York and organized under the laws of the state of New York.

64.     Defendant DOI is an executive department of the United States Government, with its headquarters and principal place of business at 1849 C Street NW, Washington, DC 20240. DOI is responsible for protecting and managing the natural resources and cultural heritage of the United States of America; providing scientific and other information about those resources; and honoring its trust responsibilities or special commitments to American Indians, Alaska Natives, Native Hawaiians, and affiliated Island Communities.[41]

65.     Defendant Scott Davis exercises the delegated authority of the AS-IA and heads the Office of the AS-IA, part of DOI.  His position is established under the authority contained in 43 U.S.C. § 1453.[42]  Davis discharges the duties of the Secretary with the authority and direct responsibility to administer a wide array of laws, regulations, and functions relating to American Indian and Alaska Native ("AI/AN") tribes, individual AI/AN trust beneficiaries, tribal members, and Indian Affairs bureaus, offices, and programs.[43]

66.     The AS-IA advises the Secretary of the Interior on Indian Affairs policy issues, communicates policy to and oversees the programs of the BIA and the Bureau of Indian Education, provides leadership in consultation with tribes, and serves as the DOI official for intra- and inter-departmental coordination and liaison within the Executive Branch on Indian matters.[44]

---

[41]     *See* "About Interior," *U.S. Department of the Interior*, available at https://www.doi.gov/about (last visited Aug. 4, 2025).
[42]     *See* "Office of the Assistant Secretary for Indian Affairs," *U.S. Department of the Interior Indian Affairs*, available at https://www.bia.gov/as-ia (last visited Aug. 4, 2025).
[43]     *Id.*
[44]     *See* "About Us," *U.S. Department of the Interior Indian Affairs*, available at https://www.bia.gov/about-us (last visited Aug. 4, 2025).

## JURISDICTION AND VENUE

67.    This case arises under the APA, 5 U.S.C. §§ 701-706.  The Town seeks judicial

review pursuant to the APA, 5 U.S.C. §§ 701-706.

68.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 1346, and the APA.  This Court may grant declaratory, injunctive, and other relief, including

vacating agency actions that are unlawful, arbitrary and capricious, or unsupported by substantial

evidence, pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

69.    Personal jurisdiction is proper because Defendants have the requisite minimum

contacts with the District of Columbia.  DOI is a federal agency established by the government of

the United States, with its principal office in the District, and Scott is sued in his official capacity.

70.    The United States has waived sovereign immunity from suit under 5 U.S.C. § 702

and 28 U.S.C. § 2409a.

71.    Venue in the United States District Court for the District of Columbia is proper

under 28 U.S.C. § 1391(b)(2) and (e), and under 5 U.S.C. § 703.

## STATUTORY BACKGROUND

72.    The Administrative Procedure Act provides a right of judicial review for any

"person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute."[45]

73.    The APA directs that the reviewing court "shall" hold unlawful and set aside agency

actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law," or that are adopted "without observance of procedure required by

law."[46]

---

[45]    5 U.S.C. § 702.
[46]    5 U.S.C. § 706(2)(A), (D).

74.     The APA also directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence . . . ."[47]

## FACTUAL BACKGROUND

### A.     Land Title to Westwoods.

75.     Westwoods is an approximately 80-acre piece of property located in Suffolk County in the Hampton Bays area of the Town **west** of the Shinnecock Canal, just north of Rte. 27 Sunrise Highway, as indicated in the GIS map accompanying ¶ 5, supra.  Westwoods consists of two contiguous lots, Suffolk County Tax Map Nos. 0900-186-02-38 and 0900-187-02-78, running north-south, bisected by Newtown Road, bordered on the north by the Great Peconic Bay and on the south by Sunrise Highway.[48]

76.     Westwoods is distinct from and not contiguous with the Shinnecock Indian Reservation, which is located **east** of the Shinnecock Canal and also located in the Town.

77.     The Nation possessed the Westwoods parcel at the time European settlers arrived in 1640.[49]

78.     On December 13, 1640, the tribal leadership of the Nation executed a deed conveying all of the Nation's rights, title, and interest in the eight square miles of land east of Canoe Place, in what is now the portion of the Town east of the Shinnecock Canal, where the Shinnecock Indian Reservation is currently located.[50]

---

[47]     5 U.S.C. § 706(2)(E).

[48]     Westwoods also includes an approximately two-acre parcel of land located immediately to the south of Sunrise Highway, Suffolk County Tax Map No. 0900-207-01-01.  That two-acre parcel is not at issue in this case.

[49]     *See Shinnecock I*, 523 F.Supp.2d 185, Trustee and Nation Defendants' Tr. Ex. 3 at I – XI (True copies of the frontispiece and introduction of the First Book of Records of the Town of Southampton, written by William S. Pelletreau, Southampton Town Clerk from 1862 to 1870, under the authority of the Town).

[50]     *See id.*, State Plaintiff's Tr. Ex. 66 at 266 – 67 (History of the Town of Southampton (East of Canoe Place), by James T. Adams, Hampton Press, Bridgehampton, N.Y. (1918)).

79.    On May 12, 1659, Sachem Wyandanch conveyed by deed the land west of Canoe Place, including what is now known as Westwoods, to the European settler John Ogden on behalf of the Nation under his authority as a tribal leader (the "Ogden Deed").[51]

80.    On April 10, 1662, Sachem Wyandanch's successor, Weany Sunk Squaw, conveyed by deed additional lands west of Canoe Place, including what is now known as Westwoods, to the European settler Thomas Topping on behalf of the Nation under his authority as a tribal leader (the "Topping Deed").[52]

81.    On October 3, 1666, Governor Nicolls of the Province of New York issued a determination recognizing the validity of the Topping Deed and the extinguishment of the Nation's aboriginal title to the land now known as Westwoods and the ownership of this land exclusively by the Town.[53]

82.    From the 17th to 18th century, there is little to no evidence that the Nation occupied or used the Westwoods parcel, which is consistent with the Nation's conveyance of the land by deed to European settlers.[54]

83.    The Nation itself has acknowledged, explicitly, the validity of these 17th century conveyances.  In a 1978 petition to the Department of the Interior, the Nation repeatedly acknowledged that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662."[55]

---

[51]    *See id.*, Town Plaintiff's Tr. Ex. 50 at 162 (Wyandanch's Deed to John Ogden, as transcribed in The First Book of Records of the Town of Southampton).
[52]    *See id.*, Town Plaintiff's Tr. Ex. 191 (New York State Archives, Albany, Deed Book 2).
[53]    *See id.*, Town Plaintiff's Tr. Ex. 66 at 54 – 56 (1666, a document (the 'Nicolls Determination') transcribed in the Minutes of the Board of Trustees of the Freeholders and Commonality of the Town of Southampton, Book 1).
[54]    *See id.*, Town Plaintiff's Tr. Ex. 73 (1703, Indian Lease for Shinnecock and Shinnecock Hills, as transcribed in the Minutes of the Board of Trustees of the Freeholders and Commonality of the Town of Southampton, Book 1); Town Plaintiff's Tr. Ex. 121 at 541 (Trustees Records of the Town of Southampton N.Y. 1741-1826).
[55]    *See* Ex. I (Excerpts from Litigation Request and Statement in Compliance with 25 CFR § 54.6 by the Shinnecock Indian Tribe") at 8 & 16; *infra* ¶ 103.

84.     Westwoods remained undeveloped for centuries with no permanent residents.

**B.     The Town Has Exercised Substantial Government Authority Over Westwoods for Centuries.**

85.     In or about 1738, the Town's proprietors laid out a 3,000-4,000-acre subdivision of property known as the "Canoe Place Division."[56]  The Canoe Place Division included at least a portion of Westwoods within its boundaries, and there is no evidence of any objection or challenge by the Nation to the laying out or allotment of the Canoe Place Division.[57]

86.     At various times during the 18th century, the Town regulated timber resources throughout the Town, as well as the rights of the Nation to cut timber on Westwoods.[58]

87.     In or around 1921, the Town widened and improved Newtown Road without any objection or protest by the Nation.[59]

88.     In 1957, Southampton adopted its zoning code and zoned Westwoods "C residential," which was a single-family residential district.[60]

89.     In 1972, pursuant to the Town's 1970 Comprehensive Plan, the Town re-zoned Westwoods "R-60," which is a residential classification for single-family residences.[61]

90.     In 1984, Southampton re-zoned Westwoods "R-80," which is another type of residential classification for single-family residences.[62]

91.     The R-80 zoning classification of Westwoods, as adopted in 1984, was omitted from the Town's subsequent zoning map, and as part of the Town's "Master Plan Update Number

---

[56]     *See Shinnecock I*, 523 F.Supp.2d at 217 (referring to T97).
[57]     *Id.*
[58]     *See id.*, at 220 (referring to T12, at 62-68).
[59]     *See id.*, at 209, n. 23 (referring to T23).
[60]     *Id.*, at 222 (referring to T5 and T265).
[61]     *Id.*, at 222 (referring to T6 and T266).
[62]     *Id.*, at 222-23 (relying on T264 and T312).

Three of 1985" it was proposed that Westwoods be reclassified from an R-80 zone to an R-60 zone.[63]

92.     Despite the Nation's request to remove markings from the zoning maps that showed the Town's zoning authority over Westwoods, the Town did not grant the Shinnecock's request that it remove markings from the zoning map that showed the Town's zoning authority over Westwoods.[64]

93.     In 1986, the Town approved the proposed changes that appeared in Town Exhibit 9, and re-zoned Westwoods R-60, through the enactment and adoption of Local Law No. 7 of 1986.[65]

94.     No Southampton Local Laws have been enacted since Local Law No. 7 of 1986 affecting or changing the R-60 zoning designation of Westwoods.[66]

95.     Westwoods remains zoned R-60 by the Town and is limited to single-family residential use.[67]

**C.     The Nation has Consistently Acknowledged that Aboriginal Title was Extinguished.**

96.     On or about July 12, 2003, the Nation directed the clearing of a portion of Westwoods to construct a casino without a permit or other civil authorization.[68]

97.     The Town, the State, the New York State Racing and Wagering Board, and the New York State Department of Environmental Conservation filed suit against the Nation and its Trustees, in their official capacities, to permanently enjoin the construction of the casino and gaming on Westwoods in violation of state and local law.

---

[63]     *Id.* (referring to T9).
[64]     *Id.*
[65]     *Id.*, at 223 (relying on T11).
[66]     *Id.*
[67]     *Id.*
[68]     *See Shinnecock I*, Case No. 2:03-cv-03243-JFB-AYS (E.D.N.Y.), Dkt. No. 245 ("Stipulation"), ¶¶ 47-48.

98.     The Nation's and Trustees' "core defense" was that New York and its political subdivisions, like the Town, "lack[ed] the power under the United States Constitution and federal common law to require the defendants to obtain any license, permit, or other form of approval to construct or operate a gaming facility at Westwoods."[69]

99.     The case ultimately proceeded to a bench trial on October 4, 2006 in United States District Court for the Eastern District of New York.[70]  The court conducted a 30-day bench trial over the course of six months involving over 20 witnesses, over 600 exhibits, and over 4,000 pages of transcripts.[71]

100.     In ruling in favor of the plaintiffs and enjoining the Nation's and Trustees' development, the court found that "the evidence overwhelmingly demonstrated in a plain and unambiguous manner that *aboriginal title* held by the Nation to the Westwoods land was extinguished in the 17th century."[72]

101.     Judge Bianco found that a series of colonial documents[73] demonstrated in "clear and unequivocal language" that the Nation had sold Westwoods to non-Indians in the 17th century, that the Town subsequently had acquired Westwoods, and the sovereign authority of the province of New York "confirmed and ratified the ownership of the land by the Town."[74]

102.     The Nation's claimed re-acquisition of Westwoods did not restore the Nation's aboriginal title in Westwoods because, once aboriginal title has been extinguished, it cannot be revived.[75]

---

[69]     *See Shinnecock I*, 523 F.Supp.2d at 192.
[70]     *Id.*, at 193-194.
[71]     *Id.*, at 188.
[72]     *Id.* (emphasis added).
[73]     *Supra* ¶¶ 78-81.
[74]     *Shinnecock I*, 523 F. Supp. 2d at 188.
[75]     *Id.*, at 271.

103.    The court observed that the 1978 Litigation Request[76] contained "perhaps the most compelling statement by the Shinnecock Nation indicating their understanding that aboriginal title in Westwoods had been extinguished."  As Judge Bianco put it:

> [T]he Shinnecock did not contest or refuse to recognize, the legality of the Ogden and Topping Deeds in connection with Westwoods; rather, the Tribe conceded the validity and legality of these deeds[.][77]

104.    When the Nation reacquired title to Westwoods two centuries later, it did so by adverse possession, an ownership construct that flows from the power of the New York state sovereign.

105.    In an 1890 dispute, the tract of land at issue included the Westwoods parcel.[78] Judge Bianco observed that "[t]he record of the *Cassady* Litigation includes no reference to any Shinnecock claim of subsisting aboriginal rights . . . ."[79]  Rather, the *Cassady* Litigation "did not include any finding or determination that (i) the Shinnecocks had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial; or (iii) the Shinnecocks had been in exclusive possession of the premises since any time prior to circa 1830."[80]

106.    In 1922, the Suffolk County Supreme Court quieted title in the Nation as against an interloper on Westwoods, who had allegedly taken loam from Westwoods without the Nation's consent, in *Shinnecock Tribe of Indians v. Hubbard* (Suffolk Cnty. Sup. Ct. Dec. 27, 1922).  This decision, too, was evaluated in the 2007 action.  "[T]he record in the *Hubbard* Litigation does not include a finding or determination that (i) the Shinnecocks claimed or had aboriginal rights in the

---

[76]    *Supra* ¶ 83.
[77]    *Id.*, at 274.
[78]    *Trustees of the Tribe of Shinnecock Indians v. James Cassady*, Supreme Court of the State of New York, Suffolk County (Jul. 21, 1890).
[79]    *Shinnecock I*, 523 F. Supp. 2d at 210.
[80]    *Id.*

subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial, or (iii) the Shinnecocks had been in possession of the premises since any time prior to circa 1850."[81]

107.    These are the authorities cited by Mr. Newland in the Newland Memorandum as support for his assertion that the Nation was adjudicated to have "good title" to Westwoods "by means of adverse possession."[82]

108.    These are the same authorities that the Nation itself endorsed when appealing the 2007 *Shinnecock* decision.  The Nation argued to the U.S. Court of Appeals for the Second Circuit that "the district court [Judge Bianco] found, ***correctly***, the Nation pursued litigation in 1890 to defend its right to occupy land including Westwoods and prevailed (the so-called <u>Cassady</u> lawsuit) . . . .  And the district court also found ***correctly*** that the Nation had pursued litigation in 1922, 32 years later, against the road foreman of the Town for removing loam from land including Westwoods without permission (the so-called <u>Hubbard</u> lawsuit)."[83]

109.    The Nation obtained relief from the district court decision permanently enjoining development of Westwoods when the Second Circuit vacated for lack of subject-matter jurisdiction.[84]

**D.    The Nation's Subsequent Efforts to Avoid State and Town Regulatory <u>Jurisdiction</u>.**

110.    In or around March of 2019, without obtaining approval from any local or state authority, the Trustees entered into a contract to construct and operate two 60-foot high electronic

---

[81]    *Id.*
[82]    Ex. A.
[83]    *See* Ex. J (Brief of Defendant-Appellant The Shinnecock Indian Nation and All Other Defendants-Appellants, *State of New York et al. v. Shinnecock Indian Nation et al.*, 08-1194-cv(L), 08-1195-cv(CON), U.S. Ct. App. (2d Cir., Jan. 20, 2011) at 86 (emphasis added).
[84]    *State of New York v. Shinnecock Indian Nation*, 686 F.3d 133 (2d Cir. 2012).

billboards on Westwoods within the right-of-way for Sunrise Highway (State Route 27) within the State's highway easement over Westwoods.[85]

111.    After issuing multiple stop-work orders that went unheeded, the State and DOT, filed suit against the Trustees and their commercial partners on May 24, 2019 for violations of New York state law.[86]

112.    The Trustees moved to dismiss on sovereign immunity grounds, claiming that the Nation's sovereign immunity from suits in New York state courts extended to the Trustees even when acting on lands off the Nation's reservation.[87]

113.    On May 18, 2020, the Supreme Court of the State of New York denied the Trustees' motion to dismiss and a preliminary injunction motion filed by the State and DOT.[88]  Both sides appealed.[89]

114.    On August 14, 2021, while the *Polite* trial court decision was on appeal, the Nation internally approved two measures to develop Westwoods, again without seeking approval from any state or local authority.[90]  The first measure was to move forward with the construction of a 200-room hotel-resort on Westwoods, and the second measure authorized Trustees to begin developing a gas station and travel plaza on Westwoods.[91]

115.    On August 2, 2024, the Nation celebrated the groundbreaking of the travel plaza.[92]

---

[85]    *See Polite*, 225 N.Y.S.3d at 85-86.
[86]    *Id.*, at 86.
[87]    *Id.*, at 87.
[88]    *Id.*, at 88.
[89]    *Id.*
[90]    Mark Harrington, "Shinnecocks OK measure to build 5-story hotel, conference center on tribal land," NEWSDAY, https://www.newsday.com/long-island/shinnecock-hotel-conference-center-vote-l73839 (last visited Aug. 4, 2025).
[91]    *Id.*
[92]    *See* "Travel Plaza Groundbreaking," *Shinnecock Indian Nation*, available at https://www.shinnecock-nsn.gov/post/travel-plaza-groundbreaking (last visited Aug. 4, 2025).

116.    On August 23, 2024, the Town issued a Stop Work Order, which the Nation ignored.

117.    On August 28, 2024, the Town issued complaints against the Nation and against one of its contractors for violations of Town Code § 287-7 and § 287-13 with respect to the installation of a driveway and curb cuts for the purpose of connecting Newtown Road to the Travel Plaza.  The Nation ignored those, too.

118.    Following additional development, the Town filed suit against the Trustees on December 20, 2024, to enjoin their oversight and direction of further travel plaza development on Westwoods in violation of state and local laws, including zoning violations.[93]

119.    The Town contends that, because Westwoods is not Indian country under 18 U.S.C. § 1151, the laws and regulations of the Town and state of New York apply to Westwoods just as those laws and regulations apply to any parcel of land, owned in fee, located within the Town.

120.    The Town relied in part on the December 4, 2024 decision by the Appellate Division of the Supreme Court of the State of New York in the *Polite* appeal, rejecting the Trustees' assertions of sovereign immunity and enjoining the Trustees' construction of billboards in the state right-of-way.

121.    The Trustees resist the Town's claims primarily on the grounds that they are entitled to the Nation's sovereign immunity from civil regulatory jurisdiction when acting on Westwoods, because the Newland Memorandum establishes, they argue, that the Nation's aboriginal title is either not extinguished or has been reinstated.  They also contend that "restricted fee" equates to Indian country, although they do not reference 18 U.S.C. § 1151.

122.    The Trustees did not seek to remove the state court action to federal court.

---

[93]    *See State Action*, Dkt. No. 1.

123.    The Town moved to preliminarily enjoin the Trustees from continuing to direct and supervise the construction of the Travel Plaza on Westwoods in violation of Town Code and New York state law.

124.    The Trustees opposed the Town's motion primarily on the grounds that the DOI's January 2 notice of the Newland Memorandum represented a "dispositive determination" that not only "removes the foundation of the *Polite* Order," but also "removes any basis for the Town's attempt to exert regulatory jurisdiction over Westwoods Territory."[94]

125.    Although the Trustees avoided any reference to Indian country under 18 U.S.C. § 1151, they asserted that the DOI's January 2 letter itself makes Westwoods "Indian Country" and that "[t]he DOI's Letter's clarification of restricted fee status removes all basis for state regulation of [Westwoods], leaving no applicable state law to enforce."[95]

126.    The Trustees also asserted that the observation in the Newland Memorandum that the Nation "has resided within its *aboriginal territory* since time immemorial" "contradicted" the Town's assertion that *aboriginal title* to Westwoods had been extinguished.[96]

127.    On March 17, 2025, New York state Supreme Court for Suffolk County, granted the Town's preliminary injunction motion and halted further construction activity on Westwoods.[97]

128.    The court observed that the Newland Memorandum "refer[red] to no legal authority or legal analysis supporting the determination that Westwoods is restricted fee land," and that "it is unknown what evidence the Solicitor's Office reviewed as part of its legal review.  Specifically, it is unknown whether the entire lengthy record from [*Shinnecock I*], which included testimony

---

[94]    *State Action*, Dkt. No 74, at 7.
[95]    *Id.*, at 20.
[96]    *Id.*, at 21 (emphasis added).
[97]    *State Action*, Dkt. No. 96.

from 20 witnesses over 30 days, various extensive expert reports, and more than 600 exhibits, was part of that review."[98]

129.    The court held that the Newland Letter "does not have the game changing consequences that the Trustees are alleging."[99]

130.    The Suffolk County court further ruled that Indian country as defined by 18 U.S.C. § 1151 does not refer to and does not recognize *restricted fee land* as Indian country,[100] and determined (like Judge Bianco in *Shinnecock I*) that the plain and unambiguous language of the colonial era documents from the 17th century,[101] demonstrate the acquisition of Westwoods by the Town and the extinguishment by the sovereign of aboriginal title to Westwoods.[102]

131.    On June 17, 2025, the Nation filed suit against the Town and Town council in the United States District Court for the Eastern District of New York seeking to enjoin the Town from asserting regulatory jurisdiction over the Nation's "restricted fee lands that the Nation has held since time immemorial."[103]

132.    The Nation contends that the Newland Memorandum establishes Westwoods as "Indian Country," and that "[b]lackletter law shields Indian Country from municipal regulation by way of zoning or ordinance."[104]

---

[98]    *Id.*, at 11-12.
[99]    *Id.*, at 11.
[100]   *Id.*, at 13.
[101]   *Supra* ¶¶ 78-81.
[102]   *Id.*, at 17.
[103]   *See Palm Tree Festival Action*, Dkt. Nos. 3, 3-1, & 11.
[104]   *Id.*, Dkt. No. 3-1 at 2; Dkt. No.11, ¶ 66 (alleging that the Town's assertion of regulatory authority over Westwoods contravenes federal law and the Constitution of the United States).

**FIRST CLAIM FOR RELIEF**
*(The DOI action is arbitrary and capricious under Section 706 of the APA)*
*Defendants' Failure to Provide a Reasoned Explanation for the DOI Action*

133.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

134.    Pursuant to 5 U.S.C. § 706, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

135.    Under the arbitrary and capricious standard, a reviewing court must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[105]

136.    "An agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[106]

137.    "[V]acatur is the normal remedy for APA Violations."[107]

138.    "[A] fundamental requirement of administrative law is that an agency set forth its reasons for decisions."[108]  "[A]n agency must explain why it chose to do what it did."[109]

139.    "[C]onclusory statements will not do; an agency's statement must be one of reasoning."[110]

---

[105]    *Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F.Supp.3d 28, 48 (D.D.C. 2019).
[106]    *Id.*, at 47-48.
[107]    *See id.*, at 55; *see, e.g.*, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decisions; an agency's failure to do so constitutes arbitrary and capricious agency action."); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner … and that explanation must be 'sufficient to enable [the Court] to conclude that the [agency's action] was the product of reasoned decisionmaking.'").
[108]    *Amerijet Int'l, Inc.*, 753 F.3d at 1350.
[109]    *Id.*
[110]    *Id.*

140.     Defendants have an obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[111]

141.     The connection must be "reasonably discernible" and the "agency decision must be supported by substantial evidence," which entails "relevant evidence as a reasonable person might accept as proof of a conclusion."[112]

142.     As alleged herein, Defendants failed to provide any details about what "data," let alone whether it was the "relevant data," they examined for Mr. Newland's review, and failed to articulate a satisfactory explanation either for the DOI action itself or for any action to supplant the Town's jurisdiction over Westwoods with that of the Nation.

143.     The single-page Newland Memorandum directed Bouchard to take the DOI action because of the "legal conclusions of the Solicitor's Office," which were purportedly based on the Solicitor's Office's "legal review of the ownership history of Westwoods."[113]

144.     The Newland Memorandum does not provide any procedural and substantive information about the Nation's purported "request" to DOI to "review the land title status of Westwoods."[114]

145.     The Newland Memorandum does not explain when the Nation made this request, by what federal statutes, regulations, or legal authority the Nation submitted this request, through what process—and does not identify what documents, testimony, or evidence the Nation submitted to DOI.

---

[111]     *Council of Parent Attorneys and Advocates*, 365 F.Supp.3d at 47-48.
[112]     *Am. Near E. Refugee Aid v. United States Agency for Int'l Dev.*, 2024 WL 2699924, at *2 (D.D.C. May 24, 2024).
[113]     *See* Ex. A.
[114]     *Id.*

146.    While the Newland Memorandum states that the Nation's request related to the "land title status of Westwoods," it does not provide any information as to what this means.

147.    Newland claims that he "requested the Solicitor's Office to conduct a legal review of the ownership history of Westwoods," but does not explain the scope, content, underlying legal authority, or purpose of such "legal review."   Aside from the non-substantive reference to 25 U.S.C. § 177, the Newland Memorandum does not cite any legal authority by which this alleged legal review was to be "conduct[ed]."

148.    The Newland Memorandum recites that the determination by the Solicitor's Office "that Westwoods is within the Nation's aboriginal territory which encompasses the Town of Southampton and other lands on eastern Long Island, NY" was made "[f]ollowing that legal review," but the Newland Memorandum includes no explanation as to the rationale, process, analysis, evidence, or legal reasoning for such purported determination.

149.    He further states that "[t]he Nation has resided within its aboriginal territory since time immemorial and has never [been] removed therefrom."

150.    The Newland Memorandum does not explain the purported legal significance of "aboriginal territory" nor residing within said territory "since time immemorial" and allegedly "never [been] removed therefrom."

151.    The Newland Memorandum excludes any legal reasoning from the Solicitor's Office for its conclusion that "Westwoods is within the purview of the Nonintercourse Act and is therefore restricted against alienation absent consent of the United States."

152.    Newland claims this was "[b]ased on" their "legal review," but does not explain what that legal review entailed.

153.    The Newland Memorandum does not explain the legal significance to how Westwoods being "within the Nation's aboriginal territory," which apparently includes the entire Town and "other lands on eastern Long Island, NY," puts a restriction against alienation on Westwoods.

154.    The Newland Memorandum also fails to explain how the Nation can have title through adverse possession yet allegedly be "never removed therefrom."

155.    Neither the Newland Memorandum nor the Jan. 2 letter provides a cogent explanation for why Defendants implemented the DOI action, thus this Court cannot conclude that Defendants' action was the product of reasoned decision making.

156.    The Newland Memorandum not only fails to cite any evidence but also fails to cogently explain what documents or evidence the Solicitor's Office reviewed for its determination that "Westwoods is within the Nation's aboriginal territory which encompasses the Town of Southampton and other lands on eastern Long Island, NY" and that the Nation "has resided within its aboriginal territory since time immemorial and has never [been] removed therefrom."

157.    The Newland Memorandum does not provide any legal analysis or reasoning to support the leap from these conclusory statements to its conclusion that Westwoods is within the "purview of the Nonintercourse Act and is therefore restricted against alienation absent consent of the United States."

158.    The Newland Memorandum also refers to "advice" that the Solicitor's Office allegedly "provided" to Newland but fails to explain what that advice entailed or how it was "provided."

159.    The final release in response to the Town's FOIA Request indicates that the administrative record for the DOI Action is limited to the Newland Memorandum and the "legal description" of Westwoods.[115]  Such a record is devoid of substantial evidence.

160.    Based on the Newland Memorandum and DOI's final release, there does not appear to be an administrative record that supports the DOI Action.

161.    For all the reasons described above, Defendants have failed to uphold their obligation to explain their actions, and this failure constitutes arbitrary and capricious action under the APA.

## SECOND CLAIM FOR RELIEF
### (The DOI action is arbitrary and capricious under Section 706 of the APA)
### Defendants' Failure to Consider An Important Aspect of the Issue

162.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 161 as if fully set forth herein.

163.    Pursuant to 5 U.S.C. § 706 a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[116]

164.    An agency's decision also is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem."[117]

165.    An agency "errs when it ignores contradictory relevant evidence regarding a critical factor in its decision."[118]

---

[115]    *See* Ex. C.
[116]    5 U.S.C. §706.
[117]    *New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61, 70 (D.D.C. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 43 (1983)).
[118]    *New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d , at 74.

166.    The extensive litigation regarding Westwoods and the Nation's position that it is the sovereign over Westwoods, which it has made abundantly clear in the publicly available filings in these various cases, put Defendants on notice that any "review" of the "land title status of Westwoods" should have involved the Town.

167.    As explained above, the bench trial in *Shinnecock I* lasted 30 days, and included over 20 witnesses, over 600 exhibits, and over 4,000 pages of transcripts.

168.    The verdict in that case determined that the Nation's "aboriginal title" to Westwoods had been extinguished in the 17th century.[119]

169.    While the Newland Memorandum does not explain what "aboriginal territory" means or how it affects Newland's conclusions, the Department should have at least reviewed the record in *Shinnecock I* as part of its "review."

170.    Even if DOI received documents from the Nation as part of the review, DOI should have consulted with the Town and included documents received from the Town.

171.    DOI's own response to public comment on its rulemaking generally acknowledges that "[d]etermining the location and extent of a Tribe's aboriginal lands often require a lengthy review of applicable law and fact."[120]

172.    Based on the final release response to the FOIA Request, the DOI Action appears to have relied exclusively on the Newland Memorandum and the "Legal Description" of Westwoods for its findings.[121]

---

[119]    *Supra* ¶ 100.
[120]    Land Acquisition Release, 88 Fed. Reg. 86241.
[121]    *See* Ex. C.

173.    The DOI Action does not appear to have included a review of the *Shinnecock I* materials as the Newland Memorandum did not reference them and the final release did not produce any documents purportedly from the *Shinnecock I* trial record.

174.    The apparent failure of Defendants even to consider an important aspect of the problem—the vast evidence previously put forth by the Town and State concerning the Nation's ownership over Westwoods—constitutes arbitrary and capricious action in violation of the APA.

175.    The timing and circumstances by which the Newland Memorandum issued, together with its lack of evidentiary support in any meaningful administrative record, are consistent with the DOI Action reflecting Newland's individual decision to issue a determination perceived as helpful to the Nation before expiration of his term in January 2025, rather than the culmination of an inquiry undertaken by the BIA in the ordinary course, or a multi-year "investigation" considering all relevant evidence and interests, including those of the Town.  Such an act by the Assistant Secretary – Indian Affairs is plainly arbitrary.

### THIRD CLAIM FOR RELIEF
***(The DOI Action Is Not Based On Substantial Evidence Under Section 706 of the APA)***

176.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 175 as if fully set forth herein.

177.    Under 5 U.S.C. § 706(2)(E), a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence . . . ."[122]

178.    A court "reviews an agency's reasoning . . . if bound up with a record-based factual conclusion, to determine whether it is supported by substantial evidence."[123]

---

[122]    5 U.S.C. § 706(2)(E).
[123]    *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999); *see also Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 188 (D.D.C. 2021) (same).

179.    "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[124]

180.    Therefore, the Court must determine "whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion."[125]

181.    An agency action must be reversed when "a reasonable mind could not accept" that the evidentiary record "provides an adequate factual basis" for the agency's decision.[126]

182.    While DOI fails to provide an adequate explanation for its apparent determination that Westwoods is restricted fee land,[127] the Newland Memorandum asserts several threadbare factual conclusions from the Solicitor's Office that DOI claims underlie the "legal conclusions . . . and . . . advice" from the Solicitor's Office for DOI's determination that Westwoods is restricted fee.[128]

183.    Therefore, the DOI's determination that Westwoods is restricted fee appears to be "bound up with [ ] record-based factual conclusion[s]," and this Court may "determine whether [they are] supported by substantial evidence."[129]

184.    As alleged below, these apparent factual conclusions "lack[] any sort of support in the record," which record does not appear to exist.[130]   Instead, the Newland memorandum impermissibly relies on "completely conclusory" factual assertions.[131]

---

[124]    *Schoenbohm v. F.C.C.*, 204 F.3d 243, 246 (D.C. Cir. 2000), *as amended* (June 28, 2000); *see also Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (same).
[125]    *See Luokung Tech. Corp.*, 538 F. Supp. 3d at 188 (quoting *Dickinson*, 527 U.S. at 164).
[126]    *Luokung Tech. Corp.*, 538 F. Supp. 3d at 188-89 (finding that agency memo did not provide substantial evidence for its conclusion because it was "completely conclusory and lack[ed] any sort of support in the record").
[127]    *Supra* ¶¶ 133-161.
[128]    *See* Ex. A.
[129]    *Dickinson*, 527 U.S. at 164.
[130]    *Luokung Tech. Corp.*, 538 F. Supp. 3d at 188-89.
[131]    *Id.*

185.    This is not a case where a court is asked to "displace . . . a choice between two fairly conflicting views" on the factual conclusions to be gleaned from the evidentiary record because there is *no* evidentiary record considered by the Department from which any conflicting view could be displaced.[132]

186.    Thus, no reasonable mind would accept that DOI's determination as to Westwoods being restricted fee is supported by substantial evidence as there does not appear to be any evidence for the completely conclusory factual assertions on which DOI's determination relies, and the DOI's finding should be set aside for the independent reason that it is unsupported by substantial evidence under 5 U.S.C. § 706(2)(E).

187.    The Newland Memorandum indicates that its direction to Bouchard to record title to Westwoods as restricted fee was "[b]ased upon the legal conclusions . . . and the advice" of the Solicitor's Office.[133]

188.    The Newland Memorandum appears to assert several threadbare factual conclusions from the Solicitor's Office.

189.    The first purported factual conclusion is that "Westwoods is within the Nation's aboriginal territory."

190.    The second is that this "aboriginal territory" apparently "encompasses the Town of Southampton and other lands on eastern Long Island, NY."[134]

191.    The third purported factual conclusion is that "[t]he Nation has resided within its aboriginal territory since time immemorial and has never [been] removed therefrom."[135]

---

[132]    *Id.*
[133]    *See* Ex. A.
[134]    *See id.*
[135]    *See id.*

192.    DOI's regulations concede that "[d]etermining the location and extent of a Tribe's aboriginal lands often requires a lengthy review of applicable law and fact."[136]  Yet none of the factual conclusions asserted by the Newland Memorandum appear to have any evidentiary support.

193.    The Newland Memorandum does not cite to any record evidence for these factual conclusions.

194.    No documents are appended to the Newland Memorandum that would suggest support for these factual conclusions.

195.    Rather, the Newland Memorandum contradicts any factual conclusion that "[t]he Nation has resided within its aboriginal territory since time immemorial and has never removed therefrom" by simultaneously acknowledging that the Nation "was adjudicated to be the fee owner of Westwoods as of approximately 1830 . . . by means of adverse possession."[137]

196.    DOI's response to the FOIA Request indicates that the DOI Action did not rely on substantial evidence.  No reasonable person could accept the Newland Memorandum and the "Legal Description" as satisfactory support for any conclusion.[138]

197.    As the DOI's determination is bound up in these purported factual conclusions, no reasonable mind could accept that they provide an adequate factual bases for the DOI to conclude that Westwoods is restricted fee.

198.    Therefore, the DOI's determination should be set aside because it is unsupported by substantial evidence in violation of 5 U.S.C. § 706(2)(E).

---

[136]    Land Acquisition Release, 88 Fed. Reg. 86241.
[137]    *See* Ex. A.
[138]    *See* Ex. C.

**FOURTH CLAIM FOR RELIEF**
*(The DOI action is inherently arbitrary and capricious under Section 706 of the APA)*
*Defendants' Failure to Provide the Town with Notice and Opportunity to be Heard*
*Concerning Potential Impacts on Town Jurisdiction*

199.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 198 as if fully set forth herein.

200.    Aside from holding title to land in restricted fee, a Tribe may own "land in trust status," which "means land the title to which is held in trust by the United States for an individual Indian or a Tribe."[139]

201.    A Tribe may seek to acquire land in trust status by filing a "written request, i.e., application, with the Secretary."[140]

202.    Pursuant to 25 U.S.C. § 5108 of the Indian Reorganization Act ("IRA"), Congress expressly authorized "the Secretary [of the Interior], in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians."[141]

203.    Section 5108 permits the Secretary of the Interior to acquire lands in trust for the benefit of Tribal governments and individual Indians.[142]

204.    25 C.F.R. § 151 "provides the procedures governing the discretionary acquisitions of lands into trust, often referred to as the fee-to-trust process" under the IRA.[143]

---

[139]    25 C.F.R. § 151.2.
[140]    25 C.F.R. § 151.8.
[141]    25 U.S.C. § 5108.
[142]    Land Acquisition Release, 88 Fed. Reg. 86222.
[143]    *Id. See also* 25 C.F.R. § 151.1 (DOI evaluates fee-to-trust land acquisition applications).

205.    The purpose of 25 C.F.R. § 151 is to "set[] forth the authorities, policies and procedures governing the acquisition of land by the United States in trust status for ... Tribes."[144]

206.    25 C.F.R. § 151.11 is one such procedure that explains the process by which the Secretary "evaluate[s] a request involving land outside of and noncontiguous to the boundaries of an Indian reservation."[145]

207.    Upon receiving the Tribe's request, "the Secretary shall *notify* the State and local governments with *regulatory jurisdiction* over the land to be acquired."[146]

208.    "The notice will inform the State or local government that each will be given 30 calendar days in which to provide written comments on the acquisition's potential impact on regulatory jurisdiction, real property taxes, and special assessments."[147]

209.    If the state or local government provides a response, these comments will be given to the Tribe, who then will be given a reasonable time in which to reply, if they choose to do so in their discretion, or request that the Secretary issue a decision.[148]

210.    Thus, DOI provides local governments (like the Town) who assert regulatory jurisdiction over land subject of the Tribe's request with *notice* and *an opportunity* to be heard regarding the "potential impact on regulatory jurisdiction" of the fee to trust acquisition.[149]

211.    Here, the Nation purportedly submitted a "request" to DOI to "record and reaffirm its land as restricted fee status."[150]

212.    The Nation claims to have submitted this request three years ago, prompting DOI to allegedly conduct an investigation that, ultimately, resulted in the DOI Action.

---

144    25 C.F.R. § 151.1
145    25 C.F.R. § 151.11.
146    *Id.* § 151.11(c) (emphasis added).
147    *Id.*
148    *Id.*
149    *Id.*
150    *See* Ex. D.

213.    Defendants did not notify the Town about any review of Westwoods until January 2, 2025—more than a week after Newland directed Bouchard to record the Nation's ownership interest in Westwoods as restricted fee.

214.    During the alleged three-year investigation, Defendants never solicited the Town's participation, or requested any documents, testimony, or any information.

215.    Defendants never provided the Town with an opportunity to be heard in a meaningful way regarding the Nation's request, including any potential impact to the Town's regulatory jurisdiction over Westwoods.

216.    The potential impact on the Town's regulatory jurisdiction over Westwoods was obvious, given the publicly available court ruling and filings concerning the litigation over Westwoods,[151] as well as the Department's decision to send notice of the action directly to the Town, after the fact.[152]

217.    If the Nation is correct that the DOI Action ousts the Town as the sovereign as would a fee to trust transfer acquisition, then the action necessarily impacts a local government's regulatory jurisdiction over Westwoods.

218.    Yet, 25 C.F.R. § 151.1 states that "[t]his part *does not* cover … transfers of land into restricted fee status unless required by Federal law."[153]

219.    As cited in the Newland Memorandum, restricted fee status is governed by the Nonintercourse Act, 25 U.S.C. § 277.

---

[151]     *Supra* ¶¶ 28-30.
[152]     *Supra* ¶¶ 41.
[153]     25 C.F.R. § 151.1 (emphasis added).

220.    DOI has not promulgated any regulations setting forth the authorities, policies, and procedures, including providing local governments with notice and an opportunity to comment on impacts to regulatory jurisdiction, for restricted fee transfers.

221.    As alleged by the Nation, its request for recordation as restricted fee stood to impact the Town's jurisdiction just as a fee to trust application would, so DOI's failure to promulgate regulations that govern requests to make land "restricted fee"—or to apply the protections embodied by current regulations for fee to trust acquisition—constitutes an arbitrary and capricious decision under the APA.

## **REQUEST FOR RELIEF**

WHEREFORE, the Town requests that this Court:

A.    Vacate and remand the DOI action for DOI to conduct any actual legal review, if undertaken, in accordance with law.

B.    Award the Town its costs and litigation expenses, including attorneys' fees and costs; and

C.    Award the Town such other and further relief as the Court deems just, proper, and equitable.

Dated:  Washington, D.C.
       August 4, 2025

Respectfully Submitted,

/s/ *Jason R. Scherr*
Jason R. Scherr (D.D.C. Bar No. 466645)
Bryan M. Killian (D.D.C. Bar No. 989803)
Benjamin Bhamdeo (D.D.C. Bar No. 1754298)
Michael T. Paslavsky (*pro hac vice forthcoming*)
jr.scherr@morganlewis.com
bryan.killian@morganlewis.com
benjamin.bhamdeo@morganlewis.com
michael.paslavsky@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave NW
Washington, D.C. 20004
Phone: 202.309.6000

*Counsel for Plaintiff the Town*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 4, 2025, a true and exact copy of the foregoing document was submitted to the Court electronically via CM/ECF to all counsel of record.

<u>/s/ Jason R. Scherr</u>